FRANK J. MILLER,

      Petitioner,

v.                                              Case No. 6:09-cv-1091-Orl-36DAB

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

_____

## <u>ORDER</u>

Petitioner initiated this action for habeas corpus relief pursuant to 28 U.S.C. section 2254 (Doc. No. 1). Upon consideration of the petition, the Court ordered Respondents to show cause why the relief sought in the petition should not be granted. Thereafter, Respondents filed a response and a supplemental response to the petition for writ of habeas corpus in compliance with this Court's instructions and with the *Rules Governing Section 2254 Cases in the United States District Courts* (Doc. Nos. 12 & 38). Petitioner filed replies to the response and supplemental response (Doc. Nos. 27, 31, 32, & 44).

Petitioner alleges four claims for relief in his habeas petition: counsel rendered ineffective assistance by (1) failing to call Mario Pierce, Desmond T. Haygood, Roland Etienne, and Coretta McGriff as witnesses, (2) failing to call Dr. Penington as a witness, (3) failing to move to suppress Petitioner's statements made during a college disciplinary

hearing, and (4) failing to investigate and acquire medical evidence and retain a sexual assault expert. For the following reasons, the petition is denied.

## I.  Procedural History

Petitioner was charged by information with sexual battery. A trial was conducted, and the jury found Petitioner guilty as charged. The state trial court sentenced Petitioner to an eight-year term of imprisonment to be followed by seven years of sex offender probation. Petitioner appealed, and the Fifth District Court of Appeal of Florida affirmed *per curiam*.

Petitioner filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The state court denied the motion. Petitioner appealed, and the Fifth District Court of Appeal of Florida affirmed *per curiam*.

Petitioner filed a second motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The state court dismissed the motion as successive. Petitioner appealed, and the Fifth District Court of Appeal of Florida affirmed *per curiam*.

Petitioner also filed a state petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel. The Fifth District Court of Appeal of Florida summarily denied the petition.

## II.  Facts Adduced at Trial

The victim testified that she had attended Bethune-Cookman College and had met Petitioner, who was also a student, when she started college. The victim said that she had

known Petitioner approximately three months prior to the sexual battery, which occurred on October 30, 2004.

According to the victim, prior to the incident, she and Petitioner had discussed seeing a movie, but that night Petitioner told her he had seen the movie already and suggested they get something to eat instead. The victim stated that Petitioner picked her up at her dorm in his vehicle and they went to the beach. The victim said they walked on the beach and then Petitioner went back to his vehicle and retrieved a bottle of lotion and a sheet. The victim testified that they sat on the sheet and she took her rings off to put on lotion. The victim said Petitioner, without her consent, subsequently pinned her down, ripped her underwear off, penetrated her vagina with his penis, and ejaculated inside of her vagina. The victim denied having any prior sexual contact with Petitioner. The victim testified that she attempted to scratch Petitioner, but her nails were acrylic and would not scratch. She said two of her acrylic nails were broken as a result of the incident.

The victim testified that she rode back to the dorm with Petitioner after the incident because she did not know where she was and did not want to call anyone to get her. She said she waited in Petitioner's vehicle while he stopped at his dorm and remained in the vehicle while Petitioner spoke with two boys outside of the car. She testified that she did not leave the car because there were a lot of people around at that time and she did not want anyone to know what had happened as she was embarrassed. She said Petitioner subsequently drove her to her dorm and walked her inside.

The victim testified that after she got to her room, she called her roommate and told her she was raped. She said she told Coretta McGriff ("McGriff"), her friend, the following day only that Petitioner had tried to rape her because she was too ashamed to tell McGriff everything Petitioner had done to her. The victim could not recall if she told McGriff that she had broken all of her nails and that Petitioner should have scratches all over him.

The victim did not call the police but was later contacted by the Dean of Women at the college who had received an anonymous call reporting the rape. As a result, the victim was examined on November 2, 2004. The nurse who examined the victim testified that she observed redness and three small tears or lacerations on the victim's cervix. The nurse further took a swab from the victim's vagina, and the State's expert testified that the DNA taken from the victim's vagina matched Petitioner's DNA.

Petitioner testified that he and the victim had consensual sexual intercourse on three occasions. According to Petitioner, on the night of the incident, he and the victim had consensual intercourse after which the victim became upset with him because she told him she might be pregnant with his child and he denied any responsibility. Petitioner said they left the beach and he stopped by his dorm before taking the victim to her dorm. Petitioner testified that he went inside the dorm and spoke to Desmond Haygood ("Haygood") while the victim remained in his car. Petitioner said he spoke with Roland Etienne ("Etienne") for approximately thirty seconds as he left his dorm to drive the victim to her dorm.

Petitioner admitted that he had testified in a college disciplinary proceeding on November 29, 2004, that he had never engaged in any sexual activity with the victim.

Petitioner further conceded that he had told an investigator on November 2, 2004, that he and the victim had consensual sex on October 30, 2004, and the victim got angry afterwards because she wanted his car and money.

## III.    *Legal Standards*

### A.    *Standard of Review Under the Antiterrorism Effective Death Penalty Act ("AEDPA")*

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider."  *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).  The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States

Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

### B.    *Standard for Ineffective Assistance of Counsel*

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[1] *Id*. at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of

---

[1]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

reasonable professional assistance. *Strickland*, 466 U.S. at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## IV.    *Analysis*

### A.    *Claims One and Two*

In claim one, Petitioner asserts that trial counsel rendered ineffective assistance by failing to call Mario Pierce ("Pierce"), Haygood, Etienne, and McGriff as witnesses. Similarly, in claim two, Petitioner maintains that counsel rendered ineffective assistance by failing to call Dr. Penington to testify.

7

In support of claim one, Petitioner argues that Pierce could have testified that he saw the victim in Petitioner's car after the sexual battery and spoke to her. According to Petitioner, Pierce said the victim exited Petitioner's vehicle at which time she told Pierce that she would mess-up Petitioner if he played with her, said she might be pregnant, and indicated Petitioner was "being nasty" about her potential pregnancy. Petitioner further maintains that Haygood could have testified that he also saw the victim in Petitioner's vehicle after the offense and spoke with her and that he served as the "lookout guy" for Petitioner and the victim when they had sexual intercourse on a prior occasion. Petitioner next contends that Etienne could have testified that he saw Petitioner and the victim "leaving the college campus" and the victim appeared to be in a good mood. Finally, Petitioner contends that McGriff could have testified that the victim told her the day after the offense that Petitioner tried to rape her, that she broke all of her nails, and that she knew Petitioner had scratches all over him.

With respect to claim two, Petitioner contends that Dr. Penington could have testified that he examined Petitioner on November 11, 2004, and Petitioner did not have any injuries on his body. Petitioner further asserts that Dr. Penington could have testified that Petitioner and the victim should have had injuries on their bodies and the victim would have left semen in Petitioner's vehicle.

Petitioner raised claims one and two in his Rule 3.850 motion. As to Petitioner's claim concerning counsel's failure to call Pierce and Etienne, the state court determined Petitioner failed to establish prejudice because the victim testified at trial that after the

incident, she waited in Petitioner's vehicle while he went into his dorm and did not seek assistance although there were people in the area. (App. I at 3.) With respect to counsel's failure to call Haygood as a witness, the court concluded Petitioner had not demonstrated prejudice because Petitioner testified at trial that he spoke to Haygood inside his dorm while the victim remained in his vehicle, in contradiction to Petitioner's post-conviction claim that Haygood came outside and observed the victim. *Id*. The court further reasoned that even accepting Petitioner's allegation as true that Haygood had served as a "lookout" on a prior occasion, Haygood did not have personal knowledge that Petitioner and the victim had previously had sexual intercourse as he was not in the room with them, and thus, could not have testified to such. *Id*. at 4. Similarly, the state court reasoned that the victim testified at trial that she told McGriff the day following the incident that Petitioner had tried to rape her, the victim indicated she did not recall if she told McGriff that she had actually inflicted scratches to the victim, and she did not deny she could have said it. *Id*. As such, the state court determined that calling McGriff to impeach the victim's testimony was not warranted as there was no prior inconsistent statement. *Id*.

In denying claim two, the state court determined that Petitioner failed to demonstrate prejudice from counsel's failure to call Dr. Penington to testify. (App. I at 5-6.) The state court reasoned that Dr. Penington's testimony was irrelevant and inadmissible because he examined Petitioner on November 11, 2004, while the incident occurred on October 30, 2004. *Id*. at 5. The state court further noted that the victim testified that she was not able to inflict any injuries on Petitioner. *Id.* Finally, the state court reasoned that

there was no allegation that Dr. Penington examined the victim, had expertise in conducting forensic sexual assault examinations, or had any foundation to challenge the sexual assault nurse's findings. *Id.*

"[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). Hence, the "petitioner must first make a sufficient factual showing, substantiating the proposed witness testimony." *Percival v. Marshall*, No. C-93-20068 RPA, 1996 WL 107279, at *3 (N.D. Cal. March 7, 1996). "Such evidence might be sworn affidavits or depositions from the potential witnesses stating to what they would have testified." *Id.*

Petitioner has failed to present evidence of actual testimony or any affidavit from Haygood or Pierce. Furthermore, Petitioner has failed to offer any evidence indicating that Dr. Penington examined the victim or is qualified to testify as a sexual assault expert. Thus, Petitioner has not made the requisite factual showing as to these purported witnesses. Petitioner's self-serving speculation will not sustain a claim of ineffective assistance of counsel.

Furthermore, Petitioner has not demonstrated that the state court's determinations are contrary to, or an unreasonable application of, clearly established federal law. With respect to Haygood's purported testimony, Petitioner testified at trial that he spoke with

10

Haygood inside the dorm while the victim remained in his car. Thus, Haygood's purported testimony that he spoke to the victim on the night of the incident would have conflicted with Petitioner's trial testimony. Furthermore, Petitioner has not alleged that Haygood observed him and the victim having sexual intercourse. As such, the state court's determination that Haygood could not testify that Petitioner and the victim had engaged in sexual intercourse on another occasion was correct.

With respect to counsel's failure to call McGriff, the record demonstrates that the victim testified that she told McGriff that Petitioner tried to rape her. Furthermore, the victim did not deny that she had told McGriff that she had broken her nails and Petitioner had to have scratches on him. Instead, the victim said she could not remember if she had done so. Therefore, counsel was not deficient for failing to call McGriff to impeach the victim's testimony concerning her nails and scratches because the victim's statement to McGriff and her testimony at trial were not inconsistent.

As to Etienne, the record reflects that he gave a statement on November 11, 2004, wherein he indicated that he and Petitioner exchanged a few words while in their respective vehicles on October 30, 2004, and a young woman was in Petitioner's vehicle and appeared to be in a good mood. (Doc. No. 27-1 at 41.) Of note, Etienne does not identify the victim as the person he observed or indicate that he spoke to the woman in Petitioner's vehicle. Thus, the Court cannot conclude that a reasonable probability exists that the outcome of the trial would have been different had Etienne been called as a witness.

Likewise, the record demonstrates that Dr. Pennington examined Petitioner on November 11, 2004, and he did not note any scratches on Petitioner. (Doc. No. 1-19 at 2.) The examination occurred approximately twelve days after the incident. As such, it is not clear that testimony that Petitioner did not have scratches on him on November 11, 2004, was relevant to whether the victim scratched him on October 30, 2004. Furthermore, there is no indication that Dr. Penington examined the victim or could have testified concerning any injuries or lack thereof on her and Petitioner.

Finally, with respect to counsel's failure to call each of these witnesses, the Court notes that Petitioner submitted a letter filed by his trial counsel with the Florida Bar in response to a grievance filed by Petitioner. Of interest, trial counsel states the following:

> Throughout my representation of Mr. Miller, he stated that he did not have sexual intercourse with the purported victim as alleged in the information. He maintained this intentional misrepresentation of the facts until on or about April 25, 2006, when I told him the DNA expert I had retained at government expense, had told me the FDLE lab results proved it was his semen that was recovered from the alleged victim. . . .

> The net effect of Mr. Miller's lying about the facts to me, as his attorney, was that a major focus of my defense efforts before trial were expended on a wasted effort. Contrary to my efforts evincing a disregard for Mr. Miller's contentions of innocence, I relied on them.

> * * *

> *From this point forward, I deposed multiple state witnesses disclosed in the case before the trial.* This included testimony concerning an administrative hearing which was video-recorded at the Bethune-Cookman College, in which Mr. Miller obviously lied about the material events of October 30, 2004, when he was alleged to have date raped the purported victim. He said he never went to the beach with her that evening, did not have sex with her, and that her statements alleging date rape were entirely contrived.

*  *  *

I spoke to Mr. Miller about his requested witnesses on or about April 27, 2006. I had requested that they be subpoenaed for trial on April 25, 2006. I was informed that the three witnesses had moved and could not be located.

I had previously reviewed the witness [sic] statements that were available from the police reports and what Mr. Miller had told me about them. At deposition, the purported victim did not digress substantially from these accounts of what had transpired upon returning to campus on the night of October 30, 2004 and thereafter. After that deposition, I had told Mr. Miller that I did not think that calling these witnesses would add to his defense. I told him I also felt that the facts involving his encounters upon return to campus, especially with Haywood, seemed to have a manipulative element to them that I didn't care to dwell on at trial. I wanted to focus on her actions which did not seem to be those of a woman, just raped. On or about the 27th, we discussed this again and the tactical benefit of having the opening and rebuttal on closing arguments, which we would lose if we put on any evidence other than [Petitioner's]. I also discussed with him, [Dr. Penington's] medical report of the exam he received in the Halifax ER. It showed facts he could readily testify to without calling. . . Dr. Penington, who was only marginally related to the case. The examination dated November 11, 2006, [sic] was not contemporaneous which undermined its value altogether, in my judgment.

When we discussed not calling the witnesses he wanted, specifically Coretta McGriff, Roland Etienne, and Desmond Haygood, I told him he had a right to call witnesses at trial and that I could request another continuance for this purpose on trial morning before jury selection. I said the judge might have to grant it as it was a Sixth Amendment right, but due to the already lengthy delays in his case, mostly because of him, she might not. It was his call and his right but if she granted the motion, it would be another 30 days in jail, waiting for his trial to begin. I told him it was up to him but I thought he should go to trial with what we had. He agreed.

*  *  *

I do not recall a witness named Mario Pierce. I definitely never heard the story described by Mr. Miller regarding an encounter by a Mr. Pierce with the alleged victim on October 30, 2004. In terms of the import of Mr. Miller's description of Mr. Pierce's interaction with the alleged victim, it is inconsistent with Mr. Haygood's statement of what Mr. Miller told him inside the dorm, at the very same time. It is also inconsistent with what my client told me about the events that evening.

13

Mr. Haygood did not say that he spoke with the alleged victim. He stated that he saw her in the car. *As to prior collateral events in the Performing Arts center, alleged by Mr. Miller, Mr. Miller didn't mention Mr. Haygood's involvement, nor mention the presence of a "lookout guy" who could corroborate this story.*

As to Mr. Etienne, he had moved from the address given on his sworn statement and did not leave a forwarding address.

It was my judgment that the significant points from the putative victim's interaction with Coretta McGriff were explored during the cross examination of the alleged victim and the SART Nurse. The alleged victim made admissions in her cross examination concerning her interaction and conversation with Ms. McGriff subsequent to Oct. 30, 2004. The forensic nurse admitted at trial she made no physical findings regarding broken nails.

Dr. Penington examined the [sic] Mr. Miller about 12 days after the alleged rape at Mr. Miller's instance [sic]. In my judgment, the value of the ER report was virtually nil. I told Mr. Miller this the first time I saw the report. . . . I described the consequence [of] losing the closing argument advantage, the limited weight of the evidence and *he agreed it wasn't necessary to call him as a witness.*

With respect to using Dr. Penington as a forensic expert in the subject of sexual assault this is a different issue. He was proposed by the client as a direct witness. An expert with proper credentials would have had to have been retained as a paid witness. . . . When one is proceeding on the client's defense that he did not have sexual intercourse with the alleged victim, it seemed that retaining a DNA expert was the most appropriate tactic, especially where the State had not developed the DNA comparison until last minute. . . .

( Doc. No. 1-17 at 2-8) (emphasis added). Thus, trial counsel was either aware of these witnesses or had never been told about the witness (Pierce) by Petitioner. Moreover, trial counsel discussed the value of the known witnesses' testimony with Petitioner, advised Petitioner that he did not think he should call the witnesses for a variety of strategic reasons, and told Petitioner the decision to call the witnesses was his to make. Petitioner

in turn agreed with counsel and chose not to call these witnesses. Trial counsel's representations in the letter comport with Petitioner's representation to the trial court at the close of evidence that he was satisfied with counsel's performance. (App. B-2 at 257.) In sum, the Court concludes that Petitioner has not demonstrated either deficient performance or prejudice based on counsel's failure to call Pierce, Haygood, Etienne, McGriff, or Dr. Penington as witnesses. Accordingly, claims one and two are denied pursuant to Section 2254(d).

### B. *Claim Three*

Petitioner contends that counsel rendered ineffective assistance by failing to move to suppress his statements made at a college disciplinary hearing in violation of the Fifth, Sixth, and Fourteenth Amendments. In support of this claim, Petitioner argues that he was not allowed to bring an attorney to the disciplinary hearing and was told that he would lose his scholarship and be expelled if he admitted to having sex with the victim. (Doc. No. 2 at 38.) Petitioner further maintains that he was told he could not leave the hearing until it was completed and was locked in a room with campus police and administrators. *Id.*

Petitioner raised this claim in his Rule 3.850 motion. Applying *Strickland,* the state court determined that Petitioner failed to demonstrate prejudice. (App. I at 6.) The state court reasoned that Petitioner was not under arrest or in custody at the time of the disciplinary hearing, the disciplinary panel was not a law enforcement entity, and the hearing was not a police interrogation so as to trigger the Sixth Amendment right to counsel or Fourth Amendment right against government-compelled self-incrimination. *Id.*

The state court further noted that the college "is a private religiously affiliated institution of higher learning." *Id.*

The Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). However, "[t]he Fifth Amendment 'not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Baxter v. Palmigiano*, 425 U.S. 308, 316-17 (1976) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). Nevertheless, "[t]he Supreme Court has expressly held that the constraints of the Fourth and Fifth Amendments do not apply to purely private activity." *United States v. Garlock*, 19 F.3d 441, 442-43 (8th Cir. 1994) (citing *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (Fourth Amendment provides no protection against private searches), and *Colorado v. Connelly*, 479 U.S. 157, 166 (1986) (even "outrageous behavior by a private party" does not violate the Fifth Amendment)).

In the instant case, at the time of Petitioner's disciplinary hearing on November 29, 2004, Petitioner had not been arrested or charged with a criminal offense. In fact, an arrest warrant was not issued for Petitioner until June 1, 2005, and he was arrested on June 18, 2005. (App. A at 18-20.) Thus, Petitioner's Sixth Amendment right to counsel had not

attached at the time of the disciplinary hearing. *See, e.g., Nash v. Auburn University*, 621 F. Supp. 948, 957-58 (D. Ala. 1985) (noting that "the great majority of cases support the conclusion that students facing disciplinary charges have no absolute right to have an attorney present their case."); *cf. Gabrilowitz v. Newman*, 582 F.2d 100, 104 (1st Cir. 1978) (holding that the plaintiff student was entitled to representation by an attorney at college disciplinary hearing given that student had pending criminal charges against him).

Furthermore, the Court notes that Petitioner did not actually provide incriminating testimony at the disciplinary hearing. Instead, he denied having sexual intercourse with the victim. Of course, Petitioner's statements at the disciplinary hearing were impeachment material. However, at trial, Petitioner testified that he lied during the disciplinary hearing because he could lose his scholarship for engaging in sexual activity. (App. B at 207.)

More importantly, the state court determined that the disciplinary hearing was conducted by a private religious college. In other words, the state court deemed Bethune-Cookman College, a church affiliated college, not to be a state actor so as to implicate Petitioner's Fifth Amendment rights during the disciplinary hearing. Petitioner has not asserted that the state court's determination that Bethune-Cookman College is a private actor is an unreasonable determination of the facts. Moreover, Petitioner has not cited, nor has this Court found, any clearly established law from the Supreme Court of the United States holding that a disciplinary hearing conducted by a private religious college entitles a student to protection pursuant to the Fifth and Sixth Amendments so as to warrant

suppression of statements made at such a hearing as a violation of the Fourteenth Amendment. *Cf. Baxter*, 425 U.S. at 316 (noting that state "[p]rison disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered 'whatever immunity is required to supplant the privilege' and may not be required to 'waive such immunity'"); *Lefkowitz*, 414 U.S. at 77 (reiterating that "the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, [however,] the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use"); *Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding that when police officers being investigated by the State were given a choice to either incriminate themselves or to forfeit their jobs pursuant to New Jersey statute and the police officers chose to make confessions, such confessions were coerced in violation of the Fifth Amendment, and Fourteenth Amendment prohibited their use in subsequent criminal prosecution of those officers). As such, Petitioner has not demonstrated that counsel was deficient for failing to move to suppress Petitioner's statements made at the administrative disciplinary hearing, nor has he established that a reasonable probability exists that the outcome of his trial would have been different had counsel moved to suppress the statements. Accordingly, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, *Strickland* or any other Supreme Court case.

## C. Claim Four

Petitioner asserts that trial counsel rendered ineffective assistance by failing to investigate and acquire medical evidence and retain a sexual assault expert to refute the State's expert. Respondents argue that this claim is procedurally barred from review by this Court because the state court dismissed the claim as it was raised in a successive Rule 3.850 motion. As such, Respondents maintain that the claim is unexhausted.

Pursuant to the AEDPA, federal courts are precluded, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Specifically, the AEDPA provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B) (I) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v.*

*Thompson*, 501 U.S. 722, 750 (1991). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id.* at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

The record indicates that Petitioner raised this claim in his second Rule 3.850 motion. The state court dismissed Petitioner's second Rule 3.850 motion, concluding it was successive. Accordingly, this claim was not exhausted, and the Court must deny the claim as procedurally barred unless Petitioner establishes one of the two exceptions to the procedural default rule.

First, a petitioner may overcome a procedural default by showing "both 'cause' for the default and actual 'prejudice' resulting from the default." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). The second exception, known as the "fundamental miscarriage of justice," only "occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.* In the present case, Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has not shown the applicability of the actual innocence exception. A review of the record reveals that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, claim four is procedurally barred and

must be denied.

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

## V.    *Certificate of Appealability*

This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   To make such a showing "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Secretary Department of Corrections*, 568 F.3d 929, 934 (11th Cir. 2009).   When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*; *Lamarca*, 568 F.3d at 934.   However, a prisoner need not show that the appeal will succeed.   *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Petitioner has not demonstrated that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.   Moreover, Petitioner cannot show that jurists of reason would find this Court's procedural rulings debatable.   Petitioner has failed to make a substantial showing of the denial of a constitutional right.   Thus, the

Court will deny Petitioner a certificate of appealability.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.      The Petition for Writ of Habeas Corpus (Doc. No. 1) filed by Frank J. Miller

is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.      Petitioner is **DENIED** a Certificate of Appealability.

3.      The Clerk of the Court is directed to enter judgment accordingly and close

this case.

**DONE AND ORDERED** in Orlando, Florida, this 15th day of June, 2012.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
OrlP-1 6/15
Counsel of Record
Frank J. Miller